(129 So. 492)

## BARBER v. STATE.
### 6 Div. 737.

Court of Appeals of Alabama.
June 30, 1930.

H. H. Hamilton, of Russellville, for appellant.

Charlie C. McCall, Atty. Gen., for the State.

RICE, J.

585

Foster, Rice & Foster, of Tuscaloosa, for appellant.

Charlie C. McCall, Atty. Gen., for the State.

BRICKEN, P. J.

Upon the submission of this cause motion was made by the Attorney General, representing the state, to strike the bill of exceptions on the ground it fails to show when it was presented. The motion is without merit, and is overruled. The bill of exceptions on page 47 contains the following indorsements:

"The above and foregoing bill of exceptions taken by the defendant, Tollie Barber, on the trial of the above cause was tendered to the Hon. John R. Bealle, Special Judge, who presided on the trial of the said cause on this the 25th day of February, 1930, which is within the time prescribed by law.

"J. R. Bealle, Special Judge.

"The above and foregoing is a true and correct bill of exceptions taken by the defendant, Tollie Barber, on the trial of the above styled cause, and is by the Hon. John R. Bealle, special judge, who presided on the trial of the said cause, signed as such true and correct bill of exceptions, on this the 8th day of March, 1930, which is within the time prescribed by law.

"J. R. Bealle, Special Judge.

"Filed in office 8 day of March, 1930, I. N. Hobson, Circuit Clerk."

These indorsements meet every requirement, and we are at a loss to understand why the state seeks to deprive this appellant of an adjudication of his appeal upon its merits, in the face of the fact that the grounds of the motion are not sustained by the bill of exceptions itself.

The court is ever reluctant to deny to any appellant, or party, a full and fair hearing upon the merits of his case, and it is an inviolable rule here never to accord to such an insistence, unless under the law or rules of practice we find we are without authority to do otherwise.

The appellant was charged by indictment with the offense of assault with intent to murder his own wife, Carrie Barber. The indictment follows literally form 14, prescribed by section 4556, Code 1923, and by the terms of said statute is sufficient. The demurrers to the indictment were properly overruled.

The defendant (appellant) upon arraignment interposed his plea of "not guilty," but the trial resulted in his conviction, as charged,

by the jury. He was duly sentenced to an indeterminate term of imprisonment in the penitentiary of not less than seven years, nor more than seven years and three months.

The evidence adduced upon the trial was widely divergent and in sharp conflict. The "statement of facts," contained in brief for appellant, appears to be substantially borne out by the record, and as therein stated is as follows:

The defendant, Tollie Barber, was convicted of assault with intent to murder Carrie Barber, his wife, and was sentenced to serve not less than seven years nor more than seven years and three months in the penitentiary.

The state's evidence tended to show: That a week or so before the alleged crime the defendant had threatened to kill his wife if she did not leave the home of one Billy Taylor, a relative of hers, where she was staying. That the defendant and his wife were not divorced, but had been separated for about two years; that on the morning before the night of the alleged crime, and on the 29th of April, 1929, the defendant had gone to the home of Billy Taylor, where his wife was staying, and had again threatened to kill her if she did not leave there. That after this defendant left Billy Taylor's house and went to one Tom Sellers, where he purchased from him a quart of Woco Pep gasoline, and that this gasoline was placed in a quart bottle which had a new cork in it, and the bottle had writing on it and pictures of flowers upon it, and that the bottle was full almost up to the bottom of the cork. That, after securing the gasoline, defendant started back to the home of Charley Wilson where he was staying and with whom he was living, and on his way he went by one F. D. Burns where the said Burns was working in some new ground. That while there the defendant poured some of the gasoline from the bottle which he had on a brush heap which the said Burns had raked up, and set fire to it for him. That while he was there talking to Burns he stated that Billy Taylor was keeping him and his wife apart and was keeping them from getting together, and that he got the gasoline and was going to Billy Taylor's house and burn his house up. That about 8 o'clock that night some one shot into the front room and kitchen of Billy Taylor's house; that the shots which were fired in the front room were fired through the window, breaking the glass and embedding themselves in the door sill and wall on the opposite side of the room and near the top of the room. That Carrie Barber was sitting in front of this window, and there were also in the room three small children who were asleep in a bed, and also Orie Taylor, Zonnie Taylor, and Ruby Taylor. Vista Taylor was also at the house, but she was in the kitchen when the shots were fired. That no one saw the defendant shoot in the window, but soon after the shots were fired Ruby Taylor started to

jump out of the kitchen window, and, when she did, the defendant halted her, and that she then recognized the defendant and saw a pistol in his hand.

The state's evidence also tended to show that the defendant set fire to a bottle of gasoline and threw the burning bottle into the room where Carrie Barber and the several other people were; that the house and also the bed were set on fire, but the fire was extinguished with little damage; that the bottle of gasoline which was thrown in the house was a bottle similar to the one which was purchased by the defendant from Tom Sellers, but that the bottle had a portion of its neck broken and was darker due to having been smoked. The evidence also tended to show that the defendant was recognized by the light of the burning bottle of gasoline; that thereafter and about midnight the officers of the law came to Billy Taylor's house and followed some tracks from the said Taylor house to the woods, where they lost the tracks, but, after going through the woods about fifty yards or more, they came into a road where the tracks were again picked up and followed to one Charley Wilson's house; that they arrived at Charley Wilson's house about 1 o'clock that night, and found the defendant there asleep; that the defendant's shoes were muddy, and at the time he was arrested he was drinking or drunk.

The state's evidence also tended to show that soon after the shooting Ruby Taylor had run out of the house and gone over to Newt Gay's, and that she was over there when the officers came, and that in a conversation with one of the officers by the name of Luke Curry she told him that it was Tollie Barber who shot into the house and who threw the burning gas therein, and the state also showed by Luke Curry that Ruby Taylor made this statement to him.

The state's evidence also tended to show that Archie Sellers said to the defendant, "Tollie, I heard you had a little trouble over there," and Tollie replied, "yes, Mr. Sellers had better stick to me."

The evidence for the state tended to show further that, when the officers went to the home of Charley Wilson that night about 1 o'clock, and after they had aroused the defendant, they found the muddy shoes, which appeared to be about the same size as those which made the tracks which they had followed, and that they then arrested the defendant and brought him on to jail.

The evidence on behalf of the defendant tended to show the following: That the defendant did not shoot into the house of Billy Taylor on the night in question, or at any other time, nor did he throw the bottle of burning gasoline therein, and his evidence tended to show that he was not present on the night of the alleged crime at the time the crime was alleged to have been committed,

nor at any other time that night; that he had nothing to do with the shooting or throwing of the burning gas into the house and that he was not guilty, and is not guilty of the charge placed against him.

The evidence of defendant tended to show that on the morning of the day that the shooting and house burning occurred he left Charley Wilson's house and went over where Newt Gay was working, and helped him load some wood on the wagon; that after working awhile he left there and went to Billy Taylor's house; that in going to Billy Taylor's house he went up the Waldrop road, which is the same road that the officers tracked the tracks in on the night of the alleged crime; that he stayed at Bill Taylor's house after arriving there about an hour and one-half, and, while there requested a private talk with his wife, because he did not wish to talk before the children; that the defendant did not have any quarrel with his wife that morning at Billy Taylor's house, nor did he threaten to kill her at that time nor at any other time; that, when he left Billy Taylor's house, he came back the Waldrop road, the same way that he went to Bill Taylor's house, and that he saw Newt Gay on his way back, but did not stop; that he spoke to Newt Gay and went on to Charley Wilson's house where the defendant was staying; that he ate dinner at Charley Wilson's house that day, and after dinner stayed around the house until about 3:30 or 4 o'clock, at which time he left to go over to Mr. Tom Sellers' to get some gasoline for the purpose of cleaning some clothes; that he did get the gasoline from Mr. Sellers, and that the gasoline he purchased was red Woco Pep gasoline, was in a quart bottle with four roses or flowers upon it, and that it had writing on the bottle and had a new cork in it, and was full almost up to the bottom of the cork; that at the time the defendant got the gasoline he tried to get Mr. Sellers to let him clean his trousers.

The evidence showed that the defendant then left Mr. Sellers' home, and that he did stop by and talk to F. D. Burns awhile, but while there he did not pour any gasoline on the brush heap and set fire to it, nor did he make the statement to F. D. Burns, or to any one, that Billy Taylor was keeping him and his wife from getting back together and was keeping them apart, and that he was going to Billy Taylor's house that night and burn it up. The evidence showed that, after leaving F. D. Burns, the defendant met one Mr. Tollie Jones, and that Mr. Jones examined the bottle which the defendant had in his hand, thinking it was whisky; that at the time he examined it the bottle was full almost up to the cork; that, after leaving the place where the defendant had talked to the said Tollie Jones, he went by Frank Wilson's house about dusky dark, and about three hundred yards from here he had talked to Tollie Jones, and, after staying there a short while, he and Frank Wilson left and went to Charley Wilson's house, where defendant lived; they arrived at Charley Wilson's house about dark, and, after getting to Charley Wilson's house, he did not leave that house any more that night until the officers came and arrested him; that Frank Wilson and his wife were at Charley Wilson's house that night until nearly 10 o'clock, at which time they went home; that besides Frank Wilson and his wife there were at the house that night Charley Wilson and his wife, Julia Barber, Harvey Mills, and the defendant himself, all of whom testified that defendant did not leave the house that night until the officers came. Defendant's evidence further showed that he went to bed at Charley Wilson's house that night and was in bed and asleep when the officers came and arrested him. The defendant's evidence also showed that he did not make a statement to Mr. Sellers that Mr. Sellers had better stand by him, and, as already stated, the defendant's evidence showed that he was not at Billy Taylor's house that night at any time, and did not do or commit any of the acts which the state's witnesses have testified were done by him.

Defendant's evidence also showed that the bottle of gasoline which he had purchased from Mr. Sellers was taken by him to the home of Charley Wilson and was placed by him in the closet behind the chimney and the wall out of the way of the children, and that defendant told one of his counsel when his case was called for trial that the bottle of gasoline which he purchased from Mr. Sellers was still at Charley Wilson's if no one had moved it, and that one of defendant's counsel went to Charley Wilson's house and found the bottle of gasoline, that it was a four-roses bottle, had pictures of flowers on it, writing on the bottle, red Woco Pep gasoline in the bottle, had a new stopper in it, was full almost to the bottom of the stopper, and that a little of the gas was poured out to identify it, and that the bottle found between the wall and the chimney in Charley Wilson's house was the same bottle of gasoline that was purchased by the defendant from Tom Sellers. The evidence further showed that the defendant had cleaned clothes for people who wanted him to do that sort of work, and that was the purpose of getting the gasoline from Mr. Sellers.

The defendant's evidence further showed that it had rained and the road was muddy the morning that he went to Billy Taylor's house, and that the tracks which the officers tracked that night were the tracks that he had made that morning.

■ We pretermit a question of the atrocity of the crime for which this appellant was convicted, as depicted by the tendency of the state's version of the facts, which version the jury adopted in its verdict, for the law is: "The guilty, as well as the innocent, have a

right to be tried in accordance with the law of the land. The innocent ought not to be punished, and the law does not intend or provide that they shall be punished; and as to the guilty, the law provides that such shall not be punished except in the mode and manner provided by the law." Patterson v. State, 202 Ala. 65, 68, 79 So. 459, 462. The foregoing simply means that any person charged with crime is entitled to a fair and impartial trial, free from injurious error. If upon appeal prejudicial error is manifest or apparent, and such error injuriously affects the legal and substantial rights of the person convicted, the appellate court must so adjudge and remand the case in order that the fundamental law of the land, as above stated, may prevail.

Upon the trial of this appellant in the court below, which trial was had by jury, with a special judge presiding, numerous exceptions were reserved to the court's rulings. Able counsel for appellant have, by brief, centered insistences of error upon seven propositions. These we will discuss in the manner of their presentation.

■ By proposition 1 it is insisted "that evidence that the defendant was drunk when he was arrested five or six hours after the alleged crime, without any evidence of defendant's condition at the time of the alleged crime, or without any evidence showing a continuation back of defendant's condition to the time of the alleged crime, is too remote and unconnected with the crime to be part of the res gestæ, and the admission of such evidence is prejudicial error." Reference to the record on this matter discloses that this point of decision is properly stated, and the exceptions reserved to the court's rulings in this connection were properly taken. That the ruling complained of is error is expressly held in the following decisions of the appellate courts of this state. Goodman v. State, 20 Ala. App. 392, 102 So. 487; Patterson v. State (Ala. App.) 126 So. 420;[1] Melton v. State, 21 Ala. App. 419, 109 So. 114; Whitfield v. State, 21 Ala. App. 490, 109 So. 524; Briley v. State, 21 Ala. App. 473, 109 So. 845; Id., 215 Ala. 106, 109 So. 846; Jones v. State, 22 Ala. App. 141, 113 So. 478.

■ By the second proposition it is insisted "a mistrial will be ordered because of the Solicitor's illegal questions, even though the court sustained objections thereto, where it clearly appears that defendant's rights were so prejudiced as to render a fair trial very doubtful." We gather from the record that this insistence is predicated upon the cross-examination by the solicitor of defendant's witness, Julia Barber, mother of the defendant, wherein the solicitor asked: "Did you and Harvey Mills a short time after this shooting took place up there, go over to Billy Taylor's house to see him about trying to get

[1] Ante, p. 428.

some kind of a settlement with him?" As to the foregoing we are unable to attach the serious import entertained and insisted upon by able counsel for appellant. It is evident, of course, that the inquiry was indulged for the purpose of attempting to show interest and bias of the witness in behalf of the accused, her own son. Ordinarily a mother's love implies the most cogent and ardent interest, and it is always permissible to inquire into facts tending to show feeling, bias, and friendly relations or otherwise of a witness. Byrd v. State, 17 Ala. App. 301, 84 So. 777. However, it is elementary that a person upon trial charged with the commission of a criminal offense could not be held bound by any statement against his interest made by a witness not in his presence and hearing. Here the trial court so stated, and sustained the defendant's objections. In addition, the court clearly and forcibly instructed the jury to the effect, in considering the case and reaching a decision, they were not to consider the matter inquired about in any manner, that it was no part of the case, and that they were to consider the case as if the question had not been asked, and to dismiss it wholly from their minds. We do not regard the court's action as error in declining to enter a mistrial for the reasons stated. A mistrial will not be ordered on the motion of the defendant, on account of illegal questions asked by the solicitor, where the court sustained defendant's objections, unless it clearly appears that the rights of the defendant have been so prejudiced as to render a fair trial a matter of grave doubt. To hold with the contention of defendant in this case would be to impede the orderly progress in criminal trials.

■ Appellant contends in his proposition 3: "A witness cannot corroborate himself by introducing other witnesses to prove that he made the same statement to them." State witness Ruby Taylor, without objection by defendant, and therefore apparently with the consent of appellant, was permitted to testify, among other things: "After I jumped out of the window I went down to Newt Gay's and Newt Gay asked me what was the matter and I said some one had set our house on fire, and I told Newt Gay it was Tollie Barber as soon as I got to his house. I had been at Newt Gay's house about five minutes when Uncle Billy Taylor came up, I did not tell him anything, Mr. Newt Gay was telling him while I was gone in the house, and that is when Uncle Billy went to call the law. I saw the law when they came, and I told Mr. Luke Curry it was Tollie Barber, telling Mr. Curry that I saw Tollie Barber there that night. I did not tell any of the rest of the law what I told Mr. Curry." The foregoing testimony was not admissible, but, as no objection thereto was interposed or exception reserved, this question is not presented. However, after defendant had closed his case, the state intro-

duced the said Curry in rebuttal, and, over the timely objection and exception of defendant, this witness Curry was permitted to testify:

"My name is L. C. Curry.

"On the night of this occurrence I went up to. Billy Taylor's house with Mr. Huff and Mr. Foss Wright. When I got up there I saw this negro girl, Ruby Taylor.

"Q. Did she make a statement to you about who it was that did it?"

The witness answered: "A. Yes, sir.

"Q. Who was it she told you?"

The witness answered: "A. Tollie Barber."

Under the elementary rules of evidence, the court committed error to a reversal in the several rulings here complained of. No extended discussion as to this is necessary. Nor need there be citation of authority.

As to proposition 4, to wit: "It was error to permit the State to prove a conversation between witness, Ruby Taylor, and the witness, Luke Curry, had in the absence of the defendant and without his knowledge. Such evidence is purely hearsay and its admission clearly erroneous and detrimental to defendant," we are forced to say the defendant was too late in arriving at such conclusion, for, as above stated, no objection to this conversation was interposed, and no ruling of the court invoked, in the absence of which the court will not be placed in error.

Propositions V, VI, and VII are as follows:

"Proposition V. The allegations and proof must correspond and it is immaterial that some other offense may have been developed by the evidence since the evidence must establish the particular offense charged in order to sustain a conviction.

"Proposition VI. One fact cannot be inferred from another fact which itself is but an inference.

"Proposition VII. To authorize a conviction of an assault with intent to murder, a specific felonious intent must be proven. This is an indispensable element of the offense. If there was not the intent to murder the person assaulted, although there may have been a general felonious intent, a conviction of the aggravated offense would be improper."

While the foregoing insistences probably state correct propositions of law, we do not regard them in the light of being applicable to the case at bar. The indictment as heretofore stated properly charged the offense complained of, and the evidence offered in support thereof was strictly in point. This evidence being without conflict, the material question upon the trial was the identity of the perpetrator of the serious crime charged and proven. The state contended and offered much evidence tending strongly to show that this appellant was the man. The defendant and his witnesses testified otherwise. Thus the question for the jury.

For the errors indicated, the judgment of conviction from which this appeal was taken must be reversed and the cause remanded, under the principles of law hereinabove announced.

Reversed and remanded.

